Filed 12/19/13  V.C. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| V.C., et al.,<br><br>    Petitioners;<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G048961<br><br>(Super. Ct. No. DP021169)<br><br>O P I N I O N |

Original proceedings; petitions for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Jacki C. Brown, Judge. Petitions denied.

Juvenile Defenders and Donna P. Chirco for Petitioner V.C.

Frank Ospino, Public Defender, Dave Dziejowski, Assistant Public Defender, Keala C. Ede and Dennis M. Nolan, Deputy Public Defenders, for Petitioner J.R.

No appearance for respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Real Party in Interest.

Law Office of Harold LaFlamme and Yana Kennedy for Minor.

Rich Pfeiffer for De Facto Parents.

\*     \*     \*

Pursuant to California Rules of Court, rule 8.450, V.C. (Mother) and J.R. (Father) seek review of the juvenile court's order terminating reunification services and scheduling a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26[1] (hereafter a section 366.26 hearing), with respect to their son, A.C. A.C. was removed from parental custody at birth due to Mother's use of methamphetamine during her pregnancy. Both parents have extensive substance abuse histories, and Mother previously lost custody of other children due to her drug use. The parents contend insufficient evidence supports the finding A.C. would be at risk if returned. They also contend that although they received over 24 months of reunification services, the services were not reasonable and the juvenile court should have extended the time for reunification. We conclude the petitions lack merit and deny them.

FACTS AND PROCEDURE

*Detention*

A.C. was detained at the hospital after his birth in late April 2011, because Mother tested positive for methamphetamine and admitted using methamphetamine two days before A.C.'s birth. Although Mother denied any prior involvement with

---

[1]      All further statutory references are to the Welfare and Institutions Code.

Child Protective Services or any prior criminal drug charges, that in fact was not the case. Two of Mother's children were the subjects of dependency proceedings in 2007 at ages seven and five due to Mother's chronic drug use and drug-related arrests, including for selling methamphetamine in the home. There had been numerous prior child abuse reports filed as to those two children involving allegations of physical abuse and neglect. Mother did not comply with any portion of her case plan, had no visits with those children, and the dependency proceedings terminated in 2008 with custody of those two children being given to their father. Mother also had a 13-year-old son, who resided with his father, and with whom Mother had no contact.

The Orange County Social Services Agency (SSA) detention report detailed Mother's criminal history, which included 2008 felony convictions for possession of controlled substances for sale, willful cruelty to a child, and possession of a stolen vehicle. In March 2010, she was again convicted of possession of controlled substances for sale, and placed on probation. Mother was in violation of her probation due to missed and dirty drug tests, that in turn resulted in her being terminated from her court-ordered treatment program (which included a 52-week parenting class). Mother had a history of psychiatric hospitalization and had abused controlled substances since she was a teenager.

Father, with whom Mother resided, also had an extensive criminal history beginning in 1998 that included felony drug-related and possession of firearms convictions. He had suffered several jail and prison sentences. He had been arrested for possession of methamphetamine just a few weeks before A.C.'s birth. Although Father was aware a hospital hold had been placed on A.C., he made no effort to contact SSA.

On May 2, 2011, a petition was filed alleging jurisdiction under sections 300, subdivision (b) [failure to protect], and (j) [abuse of sibling].

3

*Jurisdiction and Disposition Reporting Period*

In its June 2, 2011, report for the jurisdictional and dispositional hearing, SSA reported Mother's and Father's whereabouts were unknown. They had not visited A.C. or made themselves available to SSA. SSA recommended services for Father, but no services for Mother pursuant to section 361.5, subdivision (b)(13), due to her failure to reunify with her other children or to benefit from prior services. A.C. was placed in a confidential concurrent planning home, where he has remained throughout these proceedings.

On June 6, 2011, Mother and Father were arrested at their apartment. Heroin, methamphetamine, methadone, used syringes, and a used methamphetamine pipe were found in the residence. Father appeared to be under the influence, and Mother gave a false name to the police. On June 28, 2011, Mother pled guilty to possession of a controlled substance and drug paraphernalia, and was sentenced to three years' formal probation and completion of a "Prop. 36" drug program. Father was also placed on three years' formal probation.

At the combined jurisdictional and dispositional hearing on August 8, 2011, Mother and Father pleaded no contest to the allegations of the petition. The court sustained the petition as amended. The court adopted case plans for both parents. The service objectives included that both parents show an ability and willingness to have custody of their child; comply with all court orders; meet their child's physical, emotional, medical, and educational needs; obey the law and avoid arrests and convictions; stay free from illegal drugs and drug dependency; obtain and maintain suitable residence; and show they accepted responsibility for their actions. The service plan required the parents to complete substance abuse treatment and testing, a 12-Step program, parenting education, and counseling to address their substance abuse related issues. They were required to maintain contact with the social worker. Both were

4

permitted monitored visitation with A.C. A six-month review hearing was set for January 25, 2012.

*Six-Month Review Reporting Period*

In advance of the six-month review hearing, SSA social worker Robert Byczkowski reported the parents were living with the paternal grandmother and participating in most of their services. Mother was regularly drug testing, with no positive or missed tests. She was attending Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings and participating in substance abuse counseling. Father was also participating in services. He regularly drug tested. His drug tests were consistently positive for methadone, for which he had a prescription. Father's continued methadone use gave the social worker some concern about his progress with services. The social worker was also concerned that both parents had not yet begun drug counseling and treatment programs that were more comprehensive than the Prop. 36 treatment program in which they had participated. The parents' probation officer was very concerned about the parents' ability to keep A.C. in their care given their extensive substance abuse and criminal histories and given that neither had enrolled in or completed a comprehensive drug treatment program.

The parents were having regular monitored visitation with A.C. that went well. A.C. remained in his concurrent planning home, was developing well, and was bonded to his caretakers. The parents stipulated to the findings made at the six-month review hearing, which included findings that return of A.C. created a substantial risk of detriment and reasonable services had been provided. Visitation was increased and SSA was given authority to liberalize visitation to unmonitored if appropriate. A 12-month review hearing was set for August 1, 2012.

*12-Month Review Reporting Period*

In its first report for the 12-month review hearing, SSA recommended terminating reunification services and setting a section 366.26 hearing. On June 13,

5

2012, Mother and Father were arrested together at their residence—the paternal grandmother's house. Used syringes were found in Father's car, a methamphetamine pipe with burnt residue was found on Mother's dresser in their bedroom, and a loaded handgun and a butterfly knife were found hidden in the garage. Mother denied any wrongdoing and blamed Father. Father claimed the drug paraphernalia was his, but refused a DNA swab to confirm. The parents' probation officer opined the methamphetamine pipe was likely Mother's because that was her drug of choice, whereas the syringes were likely Father's because heroin was his drug of choice. Father acknowledged he touched the loaded handgun, but denied it was his and blamed the paternal grandmother for the weapon's presence hidden in the garage.

As a result of the June 13, 2012, arrests, Father's probation was revoked and he was incarcerated. Mother served 16 days for violating probation, remained on probation for two felony cases, and was ordered to enroll in "Track 2 for PC 1210" program and complete a 52-week parenting class. Mother expressed "displeasure" with the social worker when he restricted her visitation with A.C. as a result of the June 13, 2012, arrest. It was Mother's "belief that she would have been allowed to continue her visits, including unmonitored and overnight visits." The social worker had to explain to Mother why the presence of drug paraphernalia in the home resulted in restricting her visits with A.C. The social worker was very concerned about the drug paraphernalia and weapons found in the parents' home, particularly because it was drug use that brought A.C. into dependency in the first place. Mother refused to take any responsibility for the arrests. The social worker noted the arrests were particularly troubling because just before the arrests, the parents had requested he come to the home to give them clearance for unmonitored overnight visits with A.C. Thus, Mother's claim she had no knowledge of any of the contraband in her residence did not aid her cause; "Of all places [Mother] should be most familiar with, [her] home should be the most familiar." The social worker was concerned that despite their participation in services, the parents were

6

"unable to internalize any of the information presented to them in their classes, meetings, etc."

The 12-month review hearing was continued to September 5, 2012. The court ordered that Father could have monitored visitation two times a month while in local custody if the visits were not detrimental to A.C.

In August 2012, the probation officer reported to the social worker that Mother was in compliance with her probation and understood she needed to find a job and have a legitimate source of income upon completion of her counseling and perinatal programs in December 2012. The probation officer, however, believed Mother was only succeeding with her services because she was under the probation department's supervision. Father was due to be released in February 2013, at which point he would no longer be under probation supervision. Given Father's "lengthy rap sheet and [Mother's] history of drug related charges and her unsuccessful reunification plans with her other [three] children" the probation officer was very concerned about their ability to parent A.C. The 12-month review hearing was continued to October 25, 2012.

On October 24, 2012, social worker Byczkowski reported Mother had made significant progress with her case plan, including the substance abuse services. Although Mother had now already received 18 months of services, Byczkowski thought she might yet be able to reunify with A.C. if services were extended for another six months. Mother continued to reside with the paternal grandmother. She was participating in parenting classes, drug treatment programs, and substance abuse counseling. Her drug tests were negative. She was having regular visits with A.C., which were being liberalized to unmonitored, with the possibility of overnight and weekend visits being contemplated. Byczkowski's recommendation for another six months of services, however, was guarded. He remained very concerned about Mother's arrest in June 2012, with drug paraphernalia in her residence. Although Mother continued to deny the items were hers, or that she knew they were in the home, the methamphetamine pipe was found

7

on *her* dresser. Moreover, the social worker was concerned Mother still had no understanding as to the significance of her arrest as it related to the reasons for this dependency proceeding. Mother remained adamant the arrest should not have resulted in any changes to her case plan or visitation with A.C., and "should play no role in [the social worker's] recommendations to the [c]ourt."

At the combined 12-month/18-month review hearing on October 25, 2012, Mother and Father stipulated to findings including that return of A.C. to the parents posed a risk of detriment and reasonable reunification services had been offered. The juvenile court found pursuant to section 366.22, subdivision (b), it was in A.C.'s best interests to provide an additional six months of reunification services because Mother was progressing in substance abuse services and there was a substantial probability he could be returned to Mother's physical custody within that time. The court approved the case plan and visitation set forth in the January 25, 2012, report, and again authorized twice monthly visits with Father while he remained incarcerated if not detrimental to the child. It set a 24-month review hearing for April 25, 2013.

*24-Month Review Reporting Period*

In November 2012, the court granted the caretaker's request for de facto parent standing and denied Mother's request to liberalize visitation, continuing SSA's discretion to liberalize. In December 2012, after Mother's hair follicle drug test was negative, her visits were liberalized to eight hours a week unmonitored, and she began overnight visits with A.C. on January 17, 2013, and weekends on January 28. The caretakers reported A.C. was becoming resistant to leaving for visits with Mother, crying excessively and attempting to buck out of his car seat. At Mother's first overnight visit he ran out of the house crying when he realized his caretakers were leaving and could be heard screaming as they walked away.

On February 13, 2013, social worker Byczkowski reported he was still concerned about Mother's refusal to accept any responsibility for the June 2012 arrests.

8

Nonetheless, although he was "cautious" about doing so, he recommended a 60-day trial visit between Mother and A.C. starting at the end of February. On February 5, Mother called Byczkowski to report that Father had been released from jail that day. Mother said she intended to live separate from Father to prevent his interference with her reunification. Byczkowski and Mother "discuss[ed] in depth" that Mother must not allow Father to have access to A.C. during her unmonitored visitation or during her 60-day trial visit and if she did so, the trial visit could fail. Mother assured Byczkowski she would do whatever necessary to ensure Father did not have access to A.C., including having her visits at a hotel.

Byczkowski spoke with Father on February 6, the day after his release from jail, about resuming his services. Father told Byczkowski he intended to enter a residential treatment program so he would have a place to live, but he did not think he "need[ed] the treatment portion." Byczkowski told Father he could not participate in Mother's visits with A.C. and his visits had to be monitored.

Byczkowski met with Mother on February 21, 2013. She was still unemployed, and residing with the paternal grandmother, but she had been approved for an apartment that would be subsidized, or possibly free, through "Shelter Plus Care" and she could move in mid-March. Mother said she intended to rely on Father and the maternal and paternal grandmothers for financial assistance. Mother expressed anger with the social worker at any suggestion that the court might not allow a 60-day trial visit and she "took no responsibility for the lack of preparation on her part in securing housing and such."

Byczkowski also met with Father on February 21, 2013. Father was not employed and was living with his sister. He planned on moving back in with the paternal grandmother as soon as Mother moved out. Father asked for visitation with A.C. Byczkowski explained he had delayed processing a referral for monitored visits because Father said he was planning on moving into a residential treatment program and because

9

most such programs had 30 or 60-day no-contact policies. Father said he was no longer planning to live in that type of facility and was able and willing to visit. Byczkowski sent Father his referral information to begin drug testing on February 28.

On February 26, 2013, Byczkowski learned Mother had been observed with Father during her February 22 unmonitored visit with A.C. He met with Mother and Father on February 28, and asked them about the unauthorized visit, which they both acknowledged had taken place. Both parents agreed they had received very clear instructions from Byczkowski that Father could not visit with A.C. during Mother's visits. Nonetheless, they had prearranged a visit between Father and A.C. despite those instructions. Mother was angry with Father, saying he had pressured her to allow the visit. Father said he had pressured Mother. Following this event, both parents' visitation was reduced to two hours, twice per week, and was to be monitored.

In its report for the 24-month review hearing filed April 16, 2013, SSA recommended reunification services be terminated and a section 366.26 hearing be set. Mother had secured her own residence and Father had moved back in with the paternal grandmother. A.C. continued to do well in his placement, was bonded to his caretakers, and was developing normally. Mother had completed her 52-week parenting class and her perinatal program. She was doing well in after care, was testing negative, provided proof of attendance at 12-Step meetings. Father enrolled in the Health Care Agency six-month long drug treatment program on April 3, 2013. The parents had twice weekly monitored visitation.

Social worker Byczkowski was concerned Mother still had not accepted responsibility for her actions with regard to the June 2012 incident in which drug paraphernalia and weapons were found in the home where she was about to begin overnight visits with A.C. Then, right after completing a 52-week parenting program, she allowed unauthorized contact by Father, despite having understood clear directions that such contact was not allowed. Byczkowski opined Mother had "not demonstrate[d]

10

her ability to consider the child's safety and well-being." Byczkowski also reported Father's case plan progress overall was minimal. Byczkowski recommended termination of reunification services. Although the parents had made progress in their service plans, that progress kept being interrupted due to the parents' "unproductive choices." After 24 months of services, SSA still could not recommend returning A.C. to their care.

The contested 24-month review hearing began on April 26, 2013, and ultimately concluded on September 6, 2013. SSA's addendum reports filed during that time reported Father had completed 31 weeks of parent education classes and attended 12-Step meetings. Father had completed 17 weeks of substance abuse treatment and received a positive report on his participation. His drug tests were negative, but there were dilute samples on May 30 and June 3. The parents' visitation was consistent and positive. Although A.C. had been referred to therapy when Mother was having extended unmonitored visits, once visitation was reduced to four hours per week monitored, his post-visit negative behaviors subsided and therapy was no longer needed.

*24-Month Review Hearing Testimony*

Social worker Byczkowski testified at the 24-month review hearing consistent with his reports. The parents' June 2012 arrest on drug charges concerned him because drugs were the reason for A.C.'s removal and Mother's overnights were to take place in the same home where the gun and drug paraphernalia were found. Although Mother had been effectuating her case plan, Byczkowski was concerned about her ability to protect A.C. and believed she put her own interests ahead of A.C.'s. He was concerned about the parents' histories with drugs and weapons, and with their ability to follow directions. He was concerned that Mother had succumbed to pressure from Father allowing the unauthorized visit. "Although mom was doing well in her case plan services, her actions were showing quite the opposite." She participated in the programs, "but didn't internalize the information that she should have learned from those courses."

11

Byczkowski was concerned that Father had not yet completed his case plan, and he and Mother deliberately disregarded directions regarding Mother's visits knowing the consequences of violating those orders. The day after his release from jail, Byczkowski told Father he would be getting his own monitored visits, and told Mother and Father their visits would be restricted if they violated the visitation rules. They understood the rules, yet Father pressured Mother to bring A.C. for an unauthorized unmonitored visit and Mother agreed. The parents were willing to put their own desires ahead of A.C.'s best interests by ignoring requests made by SSA and the court.

Byczkowski testified his decision to restrict visitation and not start Mother's trial visit was not based solely on the unauthorized visit. "The one unauthorized visit is, again, [a] component--a reflection of the general pattern of what tends to occur." The unauthorized visit occurred immediately following a discussion he had with them — "please, don't do this. You will get your visits in time." "[M]y exact words to them were . . . if you cannot keep your child safe even from one another, then it is my job to ensure that your child will be kept safe even from you."

When Father was incarcerated, he had no visits with A.C. from June 13, 2012, to November 15, 2012. After the court ordered twice monthly visits, Father and A.C. had five visits from November 15, 2012, until his release in February 2013. Byczkowski had no contact with Father while he was in custody, but provided him with an in-custody parent packet that included weekly parenting coursework, which Father completed. Byczkowski testified it was common knowledge there were no additional services available where Father was housed. Byczkowski testified that after Father was released from custody, Byczkowski did not submit a monitored visitation referral until March 5. He was waiting to learn the no-contact rules of the residential facility Father planned to enter, so Father would not have "missed visits" counted against him. Byczkowski did not personally observe the parents' visits with A.C., but relied on the monitor's notes that indicated there were no concerns with visitation.

12

Contrary to what she initially told the social worker, Mother testified she was not pressured by Father to allow him an unauthorized visit with A.C. Although she was aware the court ordered Father's visits to be monitored, and she was told her visits could go back to monitored if she allowed Father to have unauthorized contact with A.C., she decided it was in A.C.'s best interests to have a visit with his father. She felt the social worker was not doing his job properly because he was not giving Father visits. Mother did not think the unauthorized visit placed A.C. in any danger. She did not think about the possibility A.C. would experience any renewed loss if she was caught and did not think the unauthorized visit with Father would result in "that severe of a consequence."

Mother testified she did not have a drug problem and had no concerns about a relapse. She did not think it was the NA meetings that helped her to stay clean, "it's mostly myself, you know." She felt NA meetings were not all they were "cracked up to be" and the majority of attendees were not as sober as they claimed. She attended NA meetings because they were required by her case plan, and by her perinatal and housing programs. Mother did not think she needed the support of a 12-Step program, and no longer had a sponsor. Mother denied stress was a trigger for her drug use. She did not think Father was a trigger for her drug use, even though they used drugs together, because they did not use the same drug. She was no longer involved in a relationship with Father. Mother continued to deny the drug paraphernalia found in her home in June 2012 was hers or that she had any knowledge it was there.

Mother testified she was still unemployed and she looked to the maternal grandmother for financial support. Her Shelter Plus housing did not require her to work. She was not dependent on Father.

Father testified he had begun a substance abuse program in May 2011, but could not complete it because of his arrest and incarceration. The social worker did not visit him in custody, but gave him a parenting packet that he completed. Father was

13

currently in phase one of a parenting class, he could not sign up for parenting or substance abuse classes while in custody. Father was unemployed, living with the paternal grandmother, and supported by her. Father testified that although he once had an addiction problem, he no longer did. He had been sober for two years. He did not have a sponsor. Father denied being aware of the drug paraphernalia found in his residence in June 2012; he believed it was left over from his prior drug using days. Father testified he had visits with A.C. every two weeks while he was in custody—but only five total. Father knew visits had to be supervised once he was released from custody. He was told by the social worker he must "stay away" from Mother when she was having visits with A.C. Nonetheless, Father pressured Mother into arranging a visit with A.C. because he did not feel the social worker was adequately responding to his requests for visits. Father did not expect the consequences of the unauthorized visit to be so severe. Father testified his drug triggers included old friends and old environments. He had used drugs with Mother at the paternal grandmother's home, where he was currently living.

Mother's primary perinatal counselor testified Mother had graduated from the program and completed after care. Mother's diagnosis was amphetamine dependence. She fully participated in counseling and her drug tests were all negative. He had no complaints about Mother's participation and was not concerned about her ability to implement what she had learned. He did not feel she was at risk of relapsing. The counselor did not feel attendance at NA meetings or having a sponsor was always necessary to maintain sobriety. He knew about the positive toxicology for amphetamine at A.C.'s birth. Mother denied using drugs when pregnant with her other children, but she would not explain to the counselor why they did not live with her. Mother did not tell the counselor about her felony child abuse criminal history and they did not really discuss her criminal history. The counselor and Mother did not discuss her drug use with Father, his drug use history, or her drug use patterns and triggers, rather Mother covered it in her homework and she identified stress and anxiety as her triggers. The counselor

14

had not discussed with Mother why she had permitted Father to have an unauthorized visit, but she was remorseful because it had derailed her trial visit with A.C.

A visitation monitor testified as to Mother's positive visits with A.C. Mother was appropriate with the child, they interacted well, and A.C. appeared bonded with Mother. A social worker who transported A.C. to visits, and A.C.'s caretaker, testified A.C. generally got very upset when going to visits with Mother. When visits were increased, A.C.'s behaviors escalated. The caretaker testified that when visits were increased, A.C. began expressing anger at home, waking up screaming during the nights, and hitting the caretaker and the family dog.

*Rulings*

*Section 350, Subdivision (c), Motion*

On July 2, 2013, while the 24-month review hearing was still ongoing, Mother made a motion under section 350, subdivision (c), to return A.C. to her care, in which Father joined. The court denied the motion, observing the parents' June 2012 arrest for drugs and a dangerous weapon "clearly showed that the drug issues and failure to comply with criminal laws still was not only present but ruled the judgment and lifestyle of both parents." The court was concerned that Mother did not have a NA sponsor and that she did not believe she needed one. Although Mother completed elements of her case plan, the court believed it was "only on the surface" and she had not really made substantive progress in creating "an environment that is safe and healthy for an infant." Mother took no responsibility for the arrest, blaming it on Father and insisting it should play no role in evaluating her. The court believed A.C. suffered substantial harm from Mother putting her own needs first. Just when A.C. was starting to develop a bond with Mother and was developmentally vulnerable to separation anxiety, Mother allowed Father to have unauthorized contact having been warned it could disrupt her visitation. Mother did not think A.C. "would feel anything at all regarding a loss about visitation and having to start all over again bonding." The court found Mother did not

15

examine A.C.'s needs in a realistic way, and she had a history of that behavior with all her children. The court found the delay in setting up Father's monitored visits was reasonable, and reasonable services had been provided.

*24-Month Review Ruling*

In closing argument, Mother and Father both argued there was insufficient evidence that A.C. was at risk of detriment if returned to the parents and reunification services were not reasonable. The court rejected both arguments.

The juvenile court gave a detailed statement of its reasons for its findings. The court began by noting because A.C. was taken into custody at birth, the reunification period was expedited with 12 months being the maximum statutory period for reunification. Nonetheless, the parents were given a full 24 months of services. The court found by a preponderance of the evidence the parents failed to participate regularly and make substantive progress in court-ordered programs.

As to Father, the court found there was "no question but that [he] has failed to complete the programs, much less make substantive progress in them." The primary issue was whether given Mother's participation in services, she had progressed in or "internalized" the services. Demonstrating they had truly been able to implement what they had learned from their services was essential for the parents given their "extensive years of serious substance abuse." The court found they had not. "A parent is not entitled to return of a child simply by completing the terms of a case plan, because we have to focus on the child in finding risk [of] detriment." The court observed A.C. was taken into custody because Mother had methamphetamine in her system at his birth, she had received virtually no prenatal care, and she "had a long history of drug abuse as well as a long criminal history attendant to that drug abuse." Mother had a dependency history involving her two older sons "as well as at least one instance of a mental health issue[,]" and she would not even discuss what had caused her to have no contact with her oldest son.

16

The court found Mother was not a credible witness and in her testimony "was quite unable to be honest[,] even under oath she was unable to be honest on matters that were clearly available to the parties to reveal to the court." Mother had been inconsistent about "her income and sources of income even in her Shelter Plus application for housing." Mother's lack of credibility "relate[d] to determinations of risk of detriment" because "[s]he has even now failed to understand that basic honesty to herself and others is absolutely essential before any progress can be made to eliminate a drug or substance abuse problem." The court observed 12-Step programs (which had been a requirement of Mother's service plan) were successful because they required a person to "not only be honest with themselves but then to disclose to their peers, who are also trying to remedy their substance abuse problem, of all the elements of the situation," but Mother had not effectively completed a 12-Step program. Moreover, Mother had not disclosed to her substance abuse counselor, Father's role in her substance abuse, or her own "role and responsibility" in the events that lead to Mother's June 2012 probation violation arrest. The court gave little weight to the counselor's opinion that Mother was in no danger of relapse because he relied solely on incomplete information from Mother.

The court was very concerned about Mother having permitted A.C. to have unauthorized contact with Father. It observed "[e]verybody involved in this reunification service plan was quite concerned as to what [Mother] would do upon [Father's] anticipated release in February of 2013. And almost immediately upon his release, [they] conspired . . . to violate the very provision of visitation rules that had been fully explained to them by the social worker of no unauthorized contact." Moreover, when the social worker learned about the unauthorized visit, Mother immediately blamed Father, which was the same thing she did following the June 2012 arrest. Mother was adamant neither of these events should "be used against her in her path towards reunification." The social worker had very good reasons for the no unauthorized visit rule—Father had just been released from custody and had not completed any program that would have

17

been essential for A.C.'s safety. Nonetheless, Mother was "absolutely convinced that no harm could possibly come to [A.C.]" if she allowed him unmonitored contact and therefore she believed the rule against unauthorized contact could be ignored.

The court also found Mother showed little understanding of the emotional harm her actions inflicted on A.C. by forcing him to "see-saw[]" between his biological parents and the only home he knows with his caretakers. The court noted that twice A.C. progressed in visits with the parents and began "develop[ing] bonds and rapports with [them] almost to the point of a trial return," only to have the parents suddenly "disappear either because of incarceration or because of violations at the very last minute that resulted in the trial return not occurring." The court found "the harm to [A.C.] has been devastating because he has been deprived of the one thing every infant absolutely needs, which is consistent security and stability. When parents come and then disappear, the child--the infant has no basis of forming the feeling of security, and that is equated with survival in a child this young." The court observed the harm to A.C. was evidenced by sleep disturbances and emotional upset when visitation was altered. In short, the court concluded that despite 28 months of services, "these parents have yet to learn that they must draw from the services provided to them, wisdom and judgment . . . ."

The court went on to find reasonable services had been offered to the parents. It looked to the entire 24-month reunification period. The parents stipulated at prior hearings, including at the combined 12-month/18-month review hearing in October 2012, that reasonable services were provided. Father was incarcerated twice during the reunification period, which the court observed was evidence he was not placing reunification as a priority. Nonetheless, the court found the incarcerated parent services given to Father were reasonable. Additionally, although the court believed there was no statutory provision allowing it to extend services beyond the 24-month period and even if there were, it would not extend services. The court set a section 366.26 hearing for

January 6, 2014, ordered a bonding study between A.C., Mother, and the caretakers, and allowed the parents supervised visits with A.C.

*A. Risk of Detriment*

The parents contend there is no substantial evidence to support the juvenile court's detriment finding. We disagree.

Section 366.25 governs cases in which reunification services have been extended to 24 months. At the 24-month review hearing, the child must be returned to his parent or parents, "unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.25, subd. (a)(1).) SSA has the burden of establishing detriment. (*Ibid.*) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*) If the child is not returned to his parents at the 24-month review hearing, the juvenile court must set a section 366.26 hearing. (§ 366.25, subd. (a)(3).)

"[T]he risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) Although the juvenile court must consider the parents' progress in services, "the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) "Even if the parent has 'largely complied' with his or her reunification plan and some evidence justifies return of the child, the court must look to the totality of the facts, including the parent[s'] progress, and may find that return would be detrimental if those facts warrant such a determination." (Seiser & Kumli,

Cal. Juvenile Courts Practice and Procedure (2013) § 2.151[5], p. 2-460, citing *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 703-711.)

We review the juvenile court's detriment finding for substantial evidence. (*Yvonne W.*, *supra*, 165 Cal.App.4th at pp. 1400-1401.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) On appeal, the parent has the burden of showing that there is no evidence of a sufficiently substantial nature to support the court's finding. (*Ibid*.)

Substantial evidence supports the juvenile court's detriment finding in this case. Father argues that although he was incarcerated during parts of the reunification period, seven months passed from the time he was released from custody (February 5, 2013) until the juvenile court made its detriment finding (September 6, 2013) and during that time he participated fully in services. Father primarily points to his post-release participation in parenting classes, his negative drug tests, and his positive visits with A.C.

But the issue on appeal is not whether there is some evidence that would support Father's position, but rather whether substantial evidence supports the juvenile court's finding. There is evidence supporting the court's conclusion Father did not make substantive progress with his case plan and that A.C.'s return to Father created a substantial risk of detriment to his safety, protection, or physical or emotional well-being.

Father and Mother lived together when this dependency proceeding began. Both had extensive substance abuse histories and criminal records associated with their substance abuse. A.C. was taken into protective custody at birth in April 2011, due to Mother's methamphetamine use during pregnancy; Father knew a hospital hold was placed on the infant but made no contact with SSA. Just a month after the dependency proceeding began, in June 2011, the parents suffered a drug-related arrest resulting in

20

both being placed on probation. The parents continued to reside together and thereafter participated in services. One of the express requirements of the service plan was to not break the law, avoid arrests and convictions, and show an ability and willingness to have custody of A.C. But just when the parents' visitation was being increased, and right on the eve of being cleared for overnight visits, they suffered another drug-related arrest in June 2012. Father's probation was revoked and he was incarcerated until February 2013. Less than three weeks after his release from custody, and again right on the eve of a trial 60-day release to Mother and the scheduled 24-month review hearing, Father deliberately violated the social worker's specific instructions his visits were to be monitored and he was not allowed to be at Mother's visits with A.C. Thus, he again derailed reunification. Additionally, when he was released from custody, Father told the social worker he was planning on entering a sober living home, but he delayed drug treatment and when the 24-month review hearing began, he still had not completed substance abuse treatment. Although Father asserted he was now sober, he provided two diluted tests that were considered positive. The court reasonably concluded Father's actions demonstrated he had not developed good judgment or made substantive progress in his court-ordered programs, and returning A.C. to his custody would be detrimental to A.C.'s emotional health and stability. Considering the entire history of the reunification period, we cannot say the juvenile court erred.

We turn then to Mother's argument. Mother invokes this court's observation in *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 (*Blanca P.*), "In deciding whether it would be detrimental to return a child, the easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan." (*Ibid.*) "The harder cases are, like the one before us, where the parent *has* complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes,

21

or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good). These are sensitive cases, fraught with emotional overtones, because they invariably deal with an evaluation of the *personality, character and attitudes* of the parent." (*Ibid.*)

But even with the *Blanca P.* caveat in mind, we are nonetheless bound by our substantial evidence standard of review. And we cannot say the juvenile court's finding is not supported by substantial evidence. The court gave a lengthy explanation for its conclusion that despite her participation in services, Mother failed to progress in those services. We have already detailed that explanation above and need not repeat it here. Suffice it to say, newborn A.C. came into the dependency system because of Mother's extensive substance abuse history and her use of methamphetamine while she was pregnant. Two older children were the earlier subjects of dependency proceedings for the same reasons. Mother failed to comply with her service plans as to them and she lost custody of those children. Mother would not discuss the reasons she had no contact with her oldest child. Although Mother was participating in a 12-Step program, and attending NA meetings, she was dismissive of their value to her. The court found Mother was not honest with her counselor about her drug use history or her role in the two events that resulted in her visitation with A.C. being curtailed—the June 2012 probation violation arrest and the February 2013 unauthorized visit with Father. The juvenile court also found Mother had developed no insight into the emotional damage her actions inflicted on A.C. Early in the dependency, when progressing in visits and on the eve of obtaining overnight visits, Mother was arrested with drug paraphernalia and weapons in her residence. She took no responsibility for her lack of knowledge as to the presence of contraband in her home, and was adamant it should have nothing to do with her visits or ability to reunify with A.C. Then, on the eve of getting her now almost two-year-old son placed with her for a 60-day visit, Mother deliberately ignored express directions from the social worker about Father's visits with A.C., and allowed him to have unauthorized

contact with the child. This again resulted in reduction of her visitation with A.C. and derailed reunification. Mother again insisted allowing unauthorized contact should have no impact on her visitation with A.C. Mother did not think there would be any negative impact on A.C. as a result of losing visitation with her and having to restart the bonding process anew as it began to be liberalized. Yet the caretakers reported on the significant emotional distress (screaming, kicking, hitting, and disrupted sleep) A.C. suffered in this process. In short, Mother continued to show little understanding of A.C.'s needs and the impact of her behavior on him.

Mother argues permitting unauthorized contact with Father should not have been a factor in the juvenile court's decision and she criticizes the juvenile court for its reliance on *In re Mary B.* (2013) 218 Cal.App.4th 1474 (*Mary B.*). In that case, dependency resulted primarily because of domestic violence between the parents. During reunification, the father allowed the mother to have unauthorized contact with the child during the father's overnight visits and the caretakers reported the father's aggressive behavior was escalating. (*Id.* at p. 1478.) At the six-month review hearing, the court found returning the child to her parents' custody would be detrimental, because it was still unclear if the father was learning anything from his services. The appellate court upheld that finding. (*Id.* at p. 1484.) Mother argues this case is entirely different because there are no domestic violence issues and thus no risk to A.C. associated with the unauthorized visit with Father. But here the unauthorized visit is emblematic of an overall pattern by Mother of failing to put her child's interests first.

Mother also argues the juvenile court erred by considering A.C.'s relationship with the caretakers in deciding to terminate reunification services. She refers to comments the court made in ruling on the section 350 motion concerning A.C.'s obvious distress upon realizing when being left for visits with Mother that the caretakers were leaving him. Mother cites this court's conclusion in *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507, that the quality of the relationship between the child

23

and the de facto parents "is simply not pertinent to the determination of whether [the parent's] reunification period should be brought to a close." Mother's argument is without merit. The juvenile court made clear when overruling Mother's objection to minor's counsel's questions concerning any impact removal from the caretaker's home would have on A.C., the questions were not about the relationship between the de facto parents and A.C., but went to whether there was any risk of detriment from Mother's ability or inability to understand how A.C. would be affected. In making its detriment finding, the juvenile court observed Mother demonstrated no understanding that each time visitation and reunification was derailed by her poor choices, A.C. suffered emotional harm by being "see-saw[ed]" between his biological parents and his caretakers and having his much needed stability disrupted. We find no error in the court's reasoning or its detriment finding.

## B. Reasonable Services

Mother and Father contend there is no substantial evidence to support the finding they were provided reasonable services and, therefore, despite having received 28 months of reunification services, more should have been provided. We reject their contentions. A reasonable services finding is not a prerequisite to setting a section 366.26 hearing following a 24-month hearing, and there is no authority for extending services further.

A.C. was a newborn infant when taken into protective custody. When a child under three years of age is removed from the parents' care, the parents ordinarily are entitled to receive family reunification services only "for a period of six months from the dispositional hearing as provided in subdivision (e) of [s]ection 366.21, *but no longer than 12 months from the date the child entered foster care . . . .*" (§ 361.5, subd. (a)(1)(B).) The statute governing six-month and 12-month review hearings, section 366.21, specifically requires the juvenile court to make a reasonable services finding before it may schedule a section 366.26 hearing. (See § 366.21, subd. (g)(1)(C),

24

third para. ["The court *may not* order that a hearing pursuant to section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided . . . ."] (Italics added.) Here at the six-month review hearing, the parents' stipulated reasonable services had been provided and the matter was continued for a 12-month review hearing.

Because of continuances, the 12-month review hearing became a combined 12-month/18-month review hearing. (See *In re Brian R.* (1991) 2 Cal.App.4th 904, 913-914 [status review hearing that commenced as 12-month review hearing but concluded 22 months after child was removed from parents' care properly treated as 18-month review hearing].) Prior to 2008, 18 months was the maximum time allowed for reunification for any child. Under the former version of section 366.22, if the court did not return the child to the parents at the 18-month review hearing, it was *required* to set a section 366.26 hearing. Although section 366.22, subdivision (a), required the juvenile court to "'determine whether reasonable services have been offered or provided to the parent or guardian'" (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1015 (*Mark N.*)), unlike section 366.21, "[s]ection 366.22, subdivision (a), does not give the juvenile court the option to continue reunification services nor does it specifically prohibit the court from ordering a section 366.26 hearing even if it finds reasonable reunification services have not been provided to a parent. [Citations.]" (*Mark N., supra,* 60 Cal.App.4th at pp. 1015-1016.)

In 2008, the Legislature amended section 366.22 to allow juvenile courts at the 18-month review hearing to extend services for another six months—to a 24-month maximum—under very limited and exceptional circumstances. (§ 366.22, subd. (b), as amended by Stats. 2008, ch. 482, § 3.) Under the current version of section 366.22, subdivision (a), remains much the same. If the court cannot return the child to the parents at the 18-month review hearing, it *must* set a section 366.26 hearing "[u]nless the conditions in subdivision (b) are met . . . ." (§ 366.22, subd. (a), third para.) And while

25

the juvenile court must make a reasonable services finding, setting a section 366.26 hearing is not conditioned upon such a finding. (See *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1505 (*Earl L.*); *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1511-1512 (*Denny H.*) [at the 18-month permanency review hearing, the authority of the juvenile court to set a section 366.26 hearing is not conditioned on a reasonable services finding].)

Section 366.22, subdivision (b), sets forth the *only* circumstances permitting extending services for another six months at the 18-month review hearing. The juvenile court must find by clear and convincing evidence the best interest of the child would be served by additional services because the parent has made substantial progress in a "court-ordered residential substance abuse treatment program" or has been "recently discharged" from custody or institutionalization and has made substantial progress in establishing a safe home following that recent release. (§ 366.22, subd. (b).) Here at the combined 12-month/18-month review hearing, the parties stipulated to detriment, stipulated reasonable services had been provided, and stipulated the section 366.22, subdivision (b), circumstances were present. Thus, despite having passed the statutory limit of 12 months of services for a very young child (§ 361.5, subd. (a)(1)(B)), having received 18 months of reasonable reunification services, and there being a continued risk of detriment, the court ordered another six months of services and set a 24-month review hearing.[2]

---

[2] Extending services to 24 months was not appropriate in this case. Neither of the parents met the statute's criteria for extending services—neither was in a *court-ordered residential* substance abuse program, and Father was currently incarcerated and not due for release for another four months. The social worker recommended extending services for another six months because Mother continued to progress in her services, including her substance abuse treatment plan, and might successfully reunify if services were further extended. The social worker apparently concluded because Mother was progressing in her substance abuse services, which included attending self-help meetings, group sessions, drug testing, and counseling, she qualified for an extension of services to 24 months under section 366.22, subdivision (b). But although Mother was

26

Section 366.25 governs the 24-month review hearing. Section 366.25, subdivision (a), is virtually identical to section 366.22, subdivision (a). It provides that if the child cannot be returned to the parents at the 24-month review hearing, the court *shall* order a section 366.26 hearing. (§ 366.25, subd. (a)(3).) And like section 366.22, subdivision (a), although section 366.25, subdivision (a), requires the court to make a reasonable services finding, it does not expressly condition setting a section 366.26 hearing upon that finding. (§ 366.25, subd. (a)(3).) Thus, the order setting a section 366.26 hearing at a 24-month review hearing is reviewed no differently than if the referral order was made at the 18-month review hearing under section 366.22, subdivision (a). While the juvenile court must make a reasonable services finding, an

participating in substance abuse services, nothing in the record indicates she was in a *court-ordered residential* substance abuse program. Indeed, she was residing with the paternal grandmother for most of this dependency, and moved to her own apartment thereafter.

We recognize that as relevant here, California Rules of Court, rule 5.720(b)(3)(A), applicable to 18-month review hearings, describes the circumstances under which the matter may be extended to a 24-month review as including that the parent "is making significant and consistent progress in a *substance abuse treatment program* . . . ." (Italics added.) The form stipulation utilized by the juvenile court at 18-month review hearings, allows the matter to extended to a 24-month review when the parent has "demonstrated the capacity and ability . . . to complete the objectives of his/her *substance abuse treatment plan* as evidenced by reports from a substance abuse provider . . . ." (Italics added.) The language in the court rule and the form stipulation appear to conflict with the statute. The statute is clear. It does not allow services to be extended beyond the 18-month maximum when the parent is doing well in *any* substance abuse plan. Rather, they may be extended only when the parent "is making significant and consistent progress in a *court-ordered residential* substance abuse treatment program . . . ." (§ 366.22, subd. (b), italics added.) The Legislature's rationale in allowing the extension of services under the unique circumstances outlined in section 366.22, subdivision (b), was that parents who are incarcerated, institutionalized, or court-ordered to a residential substance abuse treatment program, face unique barriers to accessing services and maintaining contact with their child. (See e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2070 (2007-2008 Reg. Sess.) as amended July 2, 2008, par. 3.) Mother was not in a court-ordered residential substance abuse program and thus there was no basis for applying section 366.22, subdivision (b), in this case.

27

order setting a section 366.26 hearing is not conditioned on a finding that reasonable services were provided. (*Denny H.*, *supra,* 131 Cal.App.4th at pp. 1511-1512.)

The parents stipulated at the six-month review hearing and the 12-month/18-month review hearing that reasonable services had been provided, and therefore they cannot argue otherwise. (See *In re Cody W.* (1994) 31 Cal.App.4th 221, 231 [where parents stipulated at six-and 12-month review hearings services were reasonable, they could not contend on appeal the services were not reasonable].) Thus, their challenge is to the services provided in the *final* review period only. Father largely complains the social worker did not meet with him during his incarceration or make sufficient effort to determine what services were available in jail. Mother largely complains the social worker did not provide sufficient input to her substance abuse therapist as to Mother's treatment goals. Both complain visits were not sufficiently liberalized during the final review period. We need not decide whether these final services were reasonable, because as this court explained in *Earl L.*, *supra,* 199 Cal.App.4th 1490, in the context of a referral order made at the 18-month review hearing under section 366.22, subdivision (a), even if the services in that final review period were found to be unreasonable, the court was required to set a section 366.26 hearing. The parents here were ultimately afforded far in excess of 24 months of reunification services—almost 29 months total—and were still unable to assume custody of A.C. at the conclusion of that period. The court was required to set a section 366.26 hearing at the end of the 24-month period, without regard to whether the services provided in the final review period were deemed reasonable.

There is no authority for the parents' contention the juvenile could continue reunification services beyond 24 months—the statutory scheme appears to be to the contrary. (See § 366.25, subd. (a)(3) [section 366.26 hearing must be ordered if child not returned to parent at 24-month review hearing].) The cases upon which they rely are inapt and involved circumstances in which no reasonable services were provided either at

28

any time during the reunification period or for the majority of it. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1777 [mother institutionalized for all but five months of 18-month reunification period]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1216 [services for majority of the 18-month reunification period "virtually nil—a 'disgrace' as the trial court put it]; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1778 [no reunification plan ever developed for the parent]; see also *Mark N., supra,* 60 Cal.App.4th 996 [no reasonable services offered to incarcerated parent during any of the 17-month reunification period].) The parents stipulated they were provided reasonable services for18 months—thus those cases have no application here. (*Earl L.*, *supra,* 199 Cal.App.4th at p. 1507.)

## DISPOSTION

The petitions are denied, as is the request to stay the section 366.26 hearing.




O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.


29